UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
IMMACULATE HEART CENTRAL SCHOOL;
JEFFREY MARRA; CHRISTOPHER INGERSON;
and RONALD SEXTON,

                            Plaintiffs,                    7:10-CV-1471

                -v-

THE NEW YORK STATE PUBLIC HIGH SCHOOL
ATHLETIC ASSOCIATION and SECTION III

                            Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

APPEARANCES:                       OF COUNSEL:

O'HARA, O'CONNELL & CIOTOLI       STEPHEN CIOTOLI, ESQ.
Attorneys for Plaintiffs             DOMINIC S. D'IMPERIO, ESQ.
7207 East Genesee Street
Fayetteville, NY 13066


OFFICE OF RENEE L. JAMES         RENEE LEE JAMES, ESQ.
Attorneys for Defendant New York State
   Public High School Athletic Association
6216 Turnwood Drive
Jamesville, NY 13078


BOND, SCHOENECK & KING, PLLC     JOHN G. McGOWAN, ESQ.
Attorneys for Defendant Section III    CLIFFORD G. TSAN, ESQ.
One Lincoln Center
Syracuse, NY 13202


DAVID N. HURD
United States District Judge

## MEMORANDUM–DECISION and ORDER

### I. INTRODUCTION

Plaintiffs Immaculate Heart Central School ("IHC"), Jeffrey Marra, Christopher Ingerson, and Ronald Sexton (collectively "plaintiffs") bring this declaratory action against defendants New York State Public High School Athletic Association (the "Athletic Association") and Section III (collectively "defendants") to enjoin them from classifying private (non-public) schools differently than public schools.  Specifically, plaintiffs assert four causes of action:  (1) violation of the Equal Protection Clause pursuant to the Fourteenth Amendment; (2) violation of the Due Process Clause pursuant to the Fourteenth Amendment; (3) violation of the Religious Freedom Restoration Act of 1993, Title 42, United States Code, section 2000bb-1, and the First Amendment; and (4) violation of Title 42, United States Code, section 1983.

Both defendants move to dismiss the complaint pursuant to Federal Rule of Civil Procedure 12(b)(6).  Plaintiffs oppose.  Oral argument was heard on April 29, 2011, in Utica, New York.  Decision was reserved.

### II. BACKGROUND

The following facts, taken from the complaint and incorporated documents, are accepted as true for purposes of the motions to dismiss.

Plaintiff IHC is a private Catholic high school located in Watertown, New York.  It is operated by the Roman Catholic Diocese of Ogdensburg, New York and incorporated by the University of the State of New York as an academic institution.  Plaintiffs Marra, Ingerson, and Sexton are the parents of sons who attend IHC and compete in IHC's interscholastic

football program.  Defendant Athletic Association is a non-profit organization responsible for governing interscholastic athletics for secondary schools in New York.

Under the Athletic Association's constitution, New York is divided into eleven geographic areas called "Sections."  Defendant Section III is one of the eleven sections and maintains its office in Onondaga County, New York.  Any secondary school within the geographic boundaries of Section III is eligible for membership upon acceptance by a majority vote of the Athletic Council[1] and upon approval of the Athletic Association.  Member schools must agree to abide by all Section III, Athletic Association, and New York State Commissioner of Education rules, regulations, and procedures.

The Athletic Association provides administrative oversight of the eleven Sections.  One of its functions is to classify member school districts into "Classes" to ensure fair and equitable interscholastic athletic competition.  According to its constitution, schools are classified annually using the preceding school year Basic Education Data ("BEDS") enrollment figures published by the New York State Department of Education.  The BEDS figures are roughly synonymous with a school's enrollment.

In November 1997 the Athletic Association amended its constitution to provide that each Section "may determine the appropriate classification for their non-public school members."  Compl. ¶ 11.  Following this, in 1998, Section III passed a resolution "to place non-public school members in the appropriate class to ensure equitable competition regardless of enrollment."  Id. ¶ 12.  Then, in 2003, to accomplish this objective, Section III enacted the classification policy at issue here for non-public schools.  A classification

---

[1]  The Athletic Council, comprised of representatives from Section III schools, establishes the rules and regulations for administering the activities of Section III.

committee also exists to place non-public school sport teams in the appropriate class.  The classification placement, as determined by the classification committee, is sport specific and reviewable on a biennial basis.  The sport specific classification is for post-season sectional competition.[2]

According to the Section III handbook, public schools are classified using only BEDS numbers.  A non-public school is initially classified based upon its enrollment where there is no significant difference in strength of programs offered by like classified public schools.  Based on its BEDS numbers, IHC was classified and "has played primarily in Class D since Section III enacted a classification system for high school football."  Compl. ¶ 10.

The Section III classification policy for non-public schools, adopted in 2003, provides that a school will be moved up in class if it meets one of the following four criteria within a two-year cycle:  (1) a winning percentage of .750 in their overall record, league record, or record in class; (2) a league and/or playoff championship; (3) a Sectional final appearance; or (4) a State championship.  Id. ¶ 14.

The classification committee met on December 15, 2009, to classify schools for the upcoming fall sports season.   Representatives from IHC attended.  At the meeting, Mike Stevens, Athletic Director and football coach for Sandy Creek Central School District, proposed IHC be moved from Class D competition up to Class C based on its previous

_____

[2] Football is a "sectional" sport meaning that, unlike some other sports, a school's football program plays schools in the same classification.

winning record.[3]  The classification committee, by vote, approved IHC's move from Class D to Class C.

On December 23, 2009, IHC appealed its reclassification to the Section III Appeal Panel.  On January 14, 2010, the Appeal Panel upheld the classification committee's decision to move IHC to Class C.  On February 2, 2010, IHC appealed to the Athletic Association.  The Athletic Association denied the appeal on February 17, 2010, and notified IHC of its denial by letter on February 22, 2010.  Plaintiffs subsequently filed this action on December 7, 2010.

## III.  DISCUSSION

### A.  Legal Standard

When deciding a motion to dismiss pursuant to Rule 12(b)(6), a plaintiff's factual allegations must be accepted as true and all reasonable inferences must be drawn in favor of the plaintiff to assess whether a plausible claim for relief has been stated.  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555–61, 127 S. Ct. 1955, 1964–67 (2007); Ashcroft v. Iqbal, __ U.S. __, 129 S. Ct. 1937, 1953 (2008) (holding that the pleading rule set forth in Twombly applies in all civil actions).  The factual allegations must be sufficient "to raise a right to relief above the speculative level," crossing the line from conceivable to plausible.  Twombly, 550 U.S. at 555, 127 S. Ct. at 1965.  Additionally, "a formulaic recitation of the elements of a cause of action will not do."  Id. at 555, 127 S. Ct. at 1965.  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the

---

[3]  In the 2008-09 school year, IHC's football team had a record of nine wins and one loss and reached the class D sectional final.  In 2009-10, the team compiled a record of seven wins and two losses and reached the class D section semifinals.

defendant is liable for the misconduct alleged."  Iqbal, 129 S. Ct. at 1949 (citing Twombly,

550 U.S. at 556, 127 S. Ct. at 1965).

Thus, in reviewing the sufficiency of the pleading, a court first may identify legal

conclusions that "are not entitled to the assumption of truth."  Id. at 1950.  The court should

then "assume [the] veracity" of "well-pleaded factual allegations . . . and determine whether

they plausibly give rise to an entitlement to relief."  Id.

Generally when considering a Rule 12(b)(6) motion, a district court is constrained

by the facts alleged in the complaint, documents attached to the complaint as exhibits, and

documents incorporated by reference in the complaint.  DiFolco v. MSNBC Cable L.L.C., 622

F.3d 104, 111 (2d Cir. 2010).  A court may nevertheless consider a document not in the

above categories "where the complaint 'relies heavily upon its terms and effect,' thereby

rendering the document 'integral' to the complaint."  Id. (quoting Mangiafico v. Blumenthal,

471 F.3d 391, 398 (2d Cir. 2006)).  "[E]ven if a document is integral to the complaint, it must

be clear on the record that no dispute exists regarding the authenticity or accuracy of the

document."  Faulkner v. Beer, 463 F.3d 130, 134 (2d Cir. 2006) (internal quotation omitted).

Further, there must not be any material disputed issues of fact regarding the document's

relevance.  Id.

Here, the complaint does not include any attached exhibits.  However, it relies on

the Athletic Association constitution and the 2010 Section III handbook.  See D'Imperio Decl.,

Ex. 1 ("Athletic Association constitution"), Dkt. No 15-1; Rathbun Aff., Ex. C ("handbook"),[4]

Dkt. No. 10-1.  The complaint makes reference to, among other things, the classification

---

[4]  The handbook contains the classification policy at issue.

committee, classification policy, enrollment numbers, and appeals process.  See Compl.,

Dkt. No. 1, ¶¶ 4, 9, 11, 34 (Athletic Association constitution); ¶¶ 14, 19, 17, 21, 27, 35

(handbook).  Because the complaint relies heavily on these documents, they are integral to it.

Further, based on the references in the complaint and IHC's membership in the Athletic

Association and Section III,[5] plaintiffs had knowledge of these documents and relied on them

in bringing suit.  There is no dispute as to the authenticity or accuracy of these documents,

and both parties clearly considered them relevant as they are referenced by plaintiffs and

defendants in their arguments.  Therefore the Athletic Association constitution and Section III

handbook will be considered in deciding the motions to dismiss.

### B.  Equal Protection Claim

### 1.  Arguments–Equal Protection

Defendants move to dismiss the First cause of action alleging an equal protection

violation.  They argue the claim must be dismissed because plaintiffs cannot prove the

classification policy violates the Equal Protection Clause since it survives rational basis

review.  They contend the classification is based on the legitimate goal of maintaining

equitable competition among member schools and the classification policy is rationally

related to achieving that goal.  The complaint acknowledges, and defendants assert, that the

classification policy attempts to remedy the competitive advantage that non-public schools

have because they are not constrained by geographic boundaries in recruiting, as are public

schools.

---

[5] Members such as IHC receive the Athletic Association constitution and Section III handbook and agree to abide by all rules and regulations.

Plaintiffs argue that defendants' perceived differences in recruiting capabilities between public and non-public schools as a justification for the unequal treatment are wholly illusory and the classification policy cannot survive rational basis review.  They fault defendants for failing to "show with at least the slightest shred of evidence that there is some factual basis for [their] unsupported assumptions of 'inequitable competition' between private and public schools."  Pls.' Mem. of Law, Dkt. No. 15, 6.  Plaintiffs contend that in reality, non-public schools do not have a competitive advantage and in fact, public schools may also recruit outside their geographic boundaries.[6]  In essence, they argue the alleged justification for the policy is nothing more than an excuse to treat non-public schools differently.

### 2.  Legal Standard–Equal Protection

"The Equal Protection Clause requires that the government treat all similarly situated people alike."  Harlen Assocs. v. Inc. Vill. of Mineola, 273 F.3d 494, 499 (2d Cir. 2001).  To prove a violation of the Equal Protection Clause, a plaintiff must first demonstrate that the two classes at issue are similarly situated.  See, e.g., Yuen Jin v. Mukasey, 538 F.3d 143, 158 (2d Cir. 2008).  Here, both public schools and non-public schools belong to Section III and the parties agree the classification policy treats non-public schools differently than public schools.  They also do not dispute that rational basis review is appropriate because no suspect class nor fundamental right is involved.

---

[6]  New York State Education Law section 3202(1) states:  "A person over five and under twenty-one years of age who has not received a high school diploma is entitled to attend the public schools maintained in the district in which such person resides without the payment of tuition."  It also provides that "[n]onresidents of a district, if otherwise competent, may be admitted into the school or schools of a district or city, upon the consent of the trustees or the board of education, upon terms prescribed by such trustees or board."  Id. § 3202(2).  Plaintiffs argue, "[l]ike a private catholic school, a public high school with a strong football program and an accommodating board of education could become a magnet school such that the lack of geographic boundaries and perhaps other advantages could accentuate the benefits of the strong program."  Pls.' Mem. Of Law, 8 (internal quotation omitted).

Plaintiffs carry a heavy burden in proving an equal protection violation under rational basis review:

> [T]he Equal Protection Clause is satisfied so long as there is a plausible policy reason for the classification, the legislative facts on which the classification is apparently based rationally may have been considered to be true by the governmental decisionmaker, and the relationship of the classification to its goal is not so attenuated as to render the distinction arbitrary or irrational.

Nordlinger v. Hahn, 505 U.S. 1, 11–12, 112 S. Ct. 2326, 2332 (1992) (internal citations omitted).  This standard of review is highly deferential toward the government and "is accorded a strong presumption of validity."  Yuen Jin, 538 F.3d at 158.  "A classification subject to rational basis review 'must be upheld against [an] equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification.'"  Id.  (quoting FCC v. Beach Commc'ns, Inc., 508 U.S. 307, 313, 113 S. Ct. 2096, 2101 (1993)).

The rational basis does need not be asserted when the classification occurs. Instead, "the burden is ultimately on the plaintiff to negate 'every conceivable basis which might support' the state's action, whether or not the basis has a foundation in the record." Smith v. Defendant A, No. 08 Civ. [ ], 2009 WL 1514590, at *4 (S.D.N.Y. May 29, 2009) (quoting Price v. N.Y. State Bd. of Elections, 540 F.3d 101, 108 (2d Cir. 2008)).  Defendants have "no obligation to produce evidence to sustain the rationality" of the challenged classification, regardless of whether the basis has any foundation in the record.  Heller v. Doe, 509 U.S. 312, 320, 113 S. Ct. 2637, 2643 (1993).  Indeed, the justification may be based on "rational speculation unsupported by evidence or empirical data."  Beach Commc'ns, 508 U.S. at 315, 113 S. Ct. at 2098.  "[R]ational-basis review in equal protection

analysis 'is not a license for courts to judge the wisdom, fairness, or logic of legislative choices.'" Heller, 509 U.S. at 319, 113 S. Ct. at 2642 (quoting Beach Commc'ns, 508 U.S. at 313, 113 S. Ct. at 2100–01).

It should be noted that conducting rational basis review at the motion to dismiss stage poses unique challenges. See Smith, 2009 WL 1514590, at *5. Many circuits have adopted a solution in which they "take as true all of the complaint's allegations and reasonable inferences that follow, and then apply the resulting facts in light of the deferential rational basis standard." Id. To survive a motion to dismiss, "a plaintiff must allege facts sufficient to overcome the presumption of rationality that applies to government classifications." Id. When neither the complaint nor the non-moving party's opposition negate "any reasonably conceivable state of facts that could provide a rational basis" for the challenged classification, a defendant's motion to dismiss an equal protection claim will be granted. See Sullivan v. City of New York, No. 08 Civ. 7294, 2011 WL 1239755, at * 4–5 (S.D.N.Y. Mar. 25, 2011) (internal quotation omitted).

In Sullivan, the complaint alleged certain provisions of the New York State Retirement and Social Security Law violated equal protection. Id. at *1. The defendants moved to dismiss. Their memorandum of law asserted that the relevant laws served the legitimate state interest of saving taxpayer money. Id. at *4. The plaintiff, through the complaint and his opposition to the motion, failed "to negate 'any reasonably conceivable state of facts that could provide a rational basis for the [challenged] classification.'" Id. (quoting Bd. of Trs. of Univ. of Alabama v. Garrett, 531 U.S. 356, 367, 121 S. Ct. 955, 964 (2001)). Accordingly, the Sullivan defendants' motion to dismiss was granted.

Similarly, in <u>Adams v. New York State Education Department</u>, the plaintiffs challenged a section of the New York State Education Law allowing the New York City Department of Education to modify disciplinary hearing procedures through collective bargaining agreements.  752 F. Supp. 2d 420, 458 (S.D.N.Y. 2010).  The defendants moved to dismiss.  Their brief asserted the provision was rational because of the New York City Department of Education's size and complexity in relation to other school districts in New York.  <u>Id</u>. at 460.  The plaintiffs did not challenge this assertion.  The court concluded that the plaintiffs, not the defendants, "have the burden of negating any rational basis for the statute, and they utterly have failed to do so."  <u>Id</u>.  As a result, the defendants' motion to dismiss the equal protection claims was granted.  <u>Id</u>.

### 3.  Bishop Grimes High School v. New York State Public High School Athletic Association[7]

### a. Facts

In the <u>Bishop Grimes</u> case, District Judge Howard G. Munson considered the Section III classification policy for non-public schools which preceded the policy at issue here.  No. 5:00-cv-1214, slip op. (N.D.N.Y. May 1, 2001) (Munson, S.J.) (unpublished decision); McGowan Decl., Ex. A, Dkt. No. 10–2.  In that case, plaintiffs Bishop Grimes High School and Bishop Ludden High School were two private Catholic schools within Section III. Both the Athletic Association and Section III were named defendants.

---

[7] Plaintiffs and defendants donate a considerable portion of their arguments to discussing the <u>Bishop Grimes</u> case.  Accordingly, the facts of that case and its prior related proceedings will be discussed in detail.

Prior to the Bishop Grimes lawsuit in 2001, as explained above, the Athletic Association amended its constitution (in 1997) to permit Sections to unilaterally determine class placement.  Section III then adopted its resolution (in 1998)[8] concerning the placement of non-public schools in classes suitable for equitable competition.  The Section III resolution incorporated a list of fourteen suggested criteria for classification of non-public schools, including:  enrollment, the strength of individual sports programs, and historical information as to sports achievements in a school's present placement.

In March 1998, shortly after the Section III resolution was passed, plaintiffs and other non-public schools were notified their classifications would be decided at an upcoming classification committee meeting.  They were provided a copy of the resolution and placement procedures, urged to submit information relevant to their classification, and to send a representative to the meeting.  At the meeting, Bishop Grimes and Bishop Ludden made presentations to the committee but offered only their BEDS numbers and a general statement of their intent to remain in their current classes.  The committee reclassified them for certain sports and appeals ensued.

As part of the appeals, plaintiffs requested other public and non-public schools within the Section submit information to the committee regarding their athletic programs, beyond BEDS numbers.[9]  On appeal, the committee reviewed the information and reversed one of its prior decisions, but upheld the remaining reclassifications.

---

[8]  At that time (2001) Section III had not yet adopted the 2003 classification policy at issue in the present matter.

[9]  The information included enrollment figures, transfer policies, athletic budgets, sports programs offered, and success rates in various sports.

Plaintiffs appealed to the Section III Executive Committee who affirmed the reclassifications.  They then appealed to the New York State Commissioner of Education.

### b.  New York State Commissioner of Education Opinion

In their appeal to the New York State Commissioner of Education ("Commissioner"), plaintiffs (referred to as petitioners) made both a facial and as-applied challenge to the Section III classification resolution.  See Appeal of Bishop Grimes High Sch., Decision No. 14,024, 1998 NY Educ. Dep't LEXIS 346 (N.Y. Educ. Dep't Oct. 14, 1998).  They argued the committee did not apply the classification criteria properly and incorrectly based its decisions on incomplete information.  As a result, they urged the reclassifications were arbitrary and capricious.

The Commissioner found the committee appropriately utilized the criteria and the plaintiff schools had a long record of dominance against their then-present competition.  He determined the committee had ample information on which to base a decision, including data submitted by other Section III schools.  He concluded that "[t]hese facts provide a rational basis for the Competition [sic] Committee's decision to move them up to a more appropriate level of competition."  Id. at *10.

Finally, the Commissioner "considered petitioners' arguments that the criteria contained in the March 5 resolution are unfair because they have been applied only to nonpublic schools."  Id. at *11.  He went on to state:

> Petitioners have not, however, argued that the achievement and maintenance of equitable competition is wrong, or that it is not a legitimate purpose of Section III. The Court of Appeals has recognized that an athletic organization may treat public and nonpublic schools differently when such action 'further[s] the identified purposes by reasonably assuring that all member schools have the opportunity to compete on a relatively level

playing field.'  <u>Archbishop Walsh High Sch. v. Section VI</u>, 88 N.Y.2d 131, 138 (1996).  The same reasoning applies in this matter.

<u>Id</u>. at *11.  He dismissed the appeal.  Plaintiffs brought suit in federal court in August 2000.

### c.  <u>Judge Munson's Decision in Bishop Grimes</u>

The <u>Bishop Grimes</u> complaint alleged that the regulations—the 1997 Athletic Association constitutional amendment and the 1998 Section III resolution—violated equal protection.  <u>Bishop Grimes,</u> Slip op. at 4–5.  The plaintiffs argued "defendants, by effectuating rules which classify nonpublic schools for purposes of interscholastic competition on the basis of considerations other than enrollment . . . [violated Equal Protection] because the same considerations do not apply to public schools with fixed geographical boundaries who are only classified by enrollment." <u>Id</u>. at 5.  Section III moved to dismiss the complaint pursuant to Rule 12(b)(6).[10]

The court determined rational basis review was appropriate and "the burden is not on the state to establish the rationality of the regulation, but upon the challenger to show that the regulation is wholly arbitrary."  <u>Id</u>. at 7.  In considering whether Section III's reclassification was rationally related to a legitimate government interest, Judge Munson noted, "'it is not the role of federal courts to set aside decisions of school administrators which the court may review as lacking wisdom and compassion.'"  <u>Id</u>. at 7–8 (quoting <u>Wood v. Strickland</u>, 420 U.S. 308, 326, 95 S. Ct. 992, 1003 (1975)).

---

[10]  Defendants point out that Judge Munson's analysis and dismissal in <u>Bishop Grimes</u> were made pursuant to the more lenient pleading standard that was in place prior to <u>Twombly</u>, 550 U.S. 544, 127 S. Ct. 1955 and <u>Iqbal</u>, 129 S. Ct. 1937.

The court went on to take judicial notice of the prior related proceedings, including the Commissioner's decision, which detailed the plaintiffs' history of dominance in the sports at issue.  In examining that portion of the Commissioner's opinion, Judge Munson explained:

> It is the responsibility of the state interscholastic athletic associations to maintain a competitive balance within the association, and to facilitate this acknowledged function by reasonably assuring that all member schools have the opportunity to compete on a relatively level playing field.  Section III's concern with the equitable competitive character between its members['] athletic teams being jeopardized is legitimate, and justified the reclassification of the plaintiffs' basketball programs to a more suitable level of competition for their athletes.  It cannot be said that Section III's action was entirely arbitrary and completely without worth in the furtherance of this valid state aim.  The court does not gauge the ultimate wisdom of Section III anew, or the profoundness of its methodological analysis.  The Section has concluded that reclassification serves the purpose of making interscholastic athletics fairer and more competitive.  It cannot be said that this action has no significant relevancy to the actualization of that goal.

Id. at 8–9 (internal citations and quotations omitted).  He concluded that "there is no set of facts that could have been proved to support a finding that defendant Section III deprived plaintiffs of a constitutional right.  Section III's motion to dismiss was granted.  Id. at 10.

### d.  Applicability of Bishop Grimes

Defendants insist Bishop Grimes is controlling while plaintiffs contend their reliance is misplaced.  Plaintiffs assert the issue here is not whether it was a violation of equal protection to reclassify IHC's football team on the basis of equitable competition, but instead "whether Defendants have any rational basis for applying completely different types of rules for members schools' athletic classifications, one for public schools and one for private catholic and parochial schools."  Pls.' Mem. of Law, 10.

Bishop Grimes is distinguishable from the instant matter on several grounds.  First, in the appeal to the Commissioner, it was determined the committee appropriately and

properly applied the classification criteria to the plaintiff schools.  By contrast, IHC (as emphasized during oral argument) challenges the entire classification policy as unconstitutional on its face.

While the Commissioner rejected the plaintiffs' argument that the criteria were unfair because they applied only to non-public schools, he did so in reliance on Archbishop Walsh, 88 N.Y.2d at 138.  He explained, "[t]he [New York] Court of Appeals has recognized that an athletic organization may treat public and nonpublic schools differently when such action 'further[s] the identified purposes by reasonably assuring that all member schools have the opportunity to compete on a relatively level playing field.'"  Appeal of Bishop Grimes High Sch., 1998 NY Educ. Dep't LEXIS 346, at *11 (quoting Archbishop Walsh, 88 N.Y.2d at 138).

In Archbishop Walsh, the Court of Appeals examined Section VI's policy requiring a majority vote for non-public schools to become members of the Section.  88 N.Y.2d 131. The court found its voting policy was rationally related to Section VI's legitimate interest in maintaining competitive balance among public schools.  Section VI advanced a number of "concrete justifications," namely "because it is a voluntary organization of only public schools that necessarily have open community enrollment, it has an interest in the character of competition that such community identity and non-selectivity engender among member schools."  Id. at 137 (internal quotation omitted).

Significantly, the Archbishop Walsh Court reviewed (and affirmed) the grant of summary judgment in favor of Section VI.  The court noted "the plaintiff's burden on this kind of constitutional attack of showing that the requirement has no rational basis."  Id. at 138. The plaintiff "fail[ed] to show that the justifications advanced by Section VI in response to this

equal protection claim are not reasonably related to the concerns of promoting rationally rooted interscholastic athletic competition." Id.  This is distinguishable.  Here, at the burden to dismiss stage plaintiffs need only provide enough facts to state a claim to relief that is plausible on its face.  By contrast, plaintiffs have a higher evidentiary burden to survive a motion for summary judgment.

Further, Archbishop Walsh held public and non-public schools may be treated differently when it "further[s] the identified purposes."  Id. at 138 (emphasis added).  The Court of Appeals did not hold that as long as an association's interest is legitimate, any policy they implement survives rational basis review.  The classification must further that interest. The defendants' interests in Bishop Grimes, Archbishop Walsh, and the present case—ensuring a level playing field and maintaining the character of competition—may be shared, but the policies vary.  In Archbishop Walsh it was Section VI's majority vote requirement for admission of non-public schools.  In Bishop Grimes it was a classification policy for non-public schools, different than the one presently used by Section III.

Whether Section III's classification policy actually furthers, and is therefore rationally related to, their interest in ensuring equitable competition is precisely the issue here.  Such inquiry is fact and policy specific, and neither Bishop Grimes nor Archbishop Walsh are dispositive.

### 4.  Analysis–Equal Protection

Section III aims "to place non-public school members in the appropriate class to ensure equitable competition regardless of enrollment."  Compl. ¶ 12.  The classification policy for non-public schools, provided in the handbook, reiterates this goal.  See Handbook, Classification Criteria for Non-Public Schools, 1.0.  The goal of maintaining balanced

competition in Section III is a legitimate interest.  To survive rational basis review, the classification must be rationally related to achieving that interest.

Defendants contend non-public schools recruit outside their geographic boundaries and therefore have a competitive advantage over public schools.  To remedy this alleged competitive advantage, Section III classifies non-public schools using factors in addition to enrollment figures.  They assert that by taking into account winning records, post-season appearances, and other statistics, the classification policy ensures equitable competition among Section III member schools.

According to plaintiffs, "a factual basis must exist in order for a classification to satisfy the rational basis test," and thus the decision to move IHC from Class D to Class C violated the Equal Protection Clause.  Compl. ¶ 26.  This argument is unavailing.  Defendants do not need to present evidence to sustain the rationality of the policy.  They are not required to show non-public schools actually recruit outside their geographic boundaries, or that public schools cannot do the same.  Defendants have asserted a justification for the classification and the burden remains with plaintiffs to negate every conceivable basis for the policy.

Plaintiffs, through the complaint and opposition papers, contend private schools do not have a competitive advantage and thus the policy which considers non-public schools' winning records is not rationally related to the stated interest.  Accepting the allegations in the complaint as true, as must be done on a motion to dismiss, "the majority of Section III's public school members also accept students from outside their geographic boundaries." Compl. ¶ 44.  Plaintiff cites a portion of the New York State Education Law which permits public schools to do so.  <u>See</u> N.Y. Educ. Law § 3202.

Plaintiffs also cite a Commissioner of Education opinion for further support.  That decision acknowledged a study conducted by Section IV during 1995–96.[11]  See Appeal of Notre Dame High Sch., Decision No. 14,104, 1999 NY Educ. Dep't LEXIS 245 (N.Y. Educ. Dep't Apr. 6, 1999).  According to the study, "[i]t appears clear from the data assembled that in certain sports, private schools have achieved greater success than most, but not all, comparably classified schools over the past decade plus."  Id. at *1.  The study found "[t]he record of the private schools in interscholastic competition generally does not seem to demonstrate an across-the-board advantage which those schools have received as the result of any distinctions between them and the public schools insofar as number and caliber of athletes enrolled is concerned."  Id. at *2.  The report went on to state, "[i]n other words, the private schools have not been strong in all sports, as one might expect if they were benefitting significantly from their enrollment advantages as a private school."  Id.

The report's conclusion was that "[i]n the absence of a good program, any theoretical advantage which a private school may have over a public school does not translate into a discernable practical advantage."  Id.  Finally, it concluded that where a private school does have a strong program, it could potentially become a magnet school and the lack of geographic boundaries could accentuate the private school's advantages.  The report recommended a sport-by-sport evaluation of private member schools, because "in certain situations, the private schools may have some benefit which, while difficult to quantify, is nonetheless present."  Id. at *3.

---

[11]  Subsequent to the study, Section IV adopted an across-the-board reclassification of non-public schools, contrary to the report's recommendations.  The Commissioner found the blanket reclassification was arbitrary and capricious and ordered the actions set aside.

IHC has alleged sufficient facts to overcome the presumption of rationality that applies to government classifications.  See Smith, 2009 WL 1514590, at *5.  Accepting the allegations as true, they asserted facts to negate defendants' explanation that non-public schools have a competitive advantage because they can recruit without geographic boundaries.

In Sullivan and Adams, cited above, the defendants offered a justification for the unequal treatment and the reviewing court concluded the state's interest was legitimate and the classification rationally related to achieving that interest.  Neither the plaintiffs in Sullivan nor Adams negated defendants' proffered reasons.  By contrast, the plaintiffs here have alleged facts, which if true, could negate defendants' proposed basis for classifying non-public schools differently than public schools.

Taking the facts in the complaint as true (even if doubtful), and making all inferences in plaintiffs' favor, they have met their burden at the motion to dismiss stage. They have alleged "enough facts to state a claim to relief that is plausible on its face" and have raised a right to relief above the speculative level.  Twombly, 550 U.S. at 570, 127 S. Ct. at 1974.  The complaint and opposition provide a basis to conclude that there is a complete and utter lack of "rational relationship between the disparity of treatment and some legitimate governmental purpose."  See Heller, 509 U.S. at 320, 113 S. Ct. at 2642.

**5.  Conclusion–Equal Protection**

Plaintiffs have stated a claim for the deprivation of equal protection of the law and dismissal at this early point in the litigation is inappropriate.  Accordingly, defendants' motions to dismiss the equal protection claim will be denied.

### C. Due Process Claim[12]

#### 1. Arguments–Due Process

Defendants move to dismiss the Second cause of action alleging a violation of the Due Process Clause.  They argue the claim fails at the threshold because participation in interscholastic athletics is not a protected interest and thus plaintiffs are not entitled to procedural due process.  Plaintiffs contend they were deprived of procedural due process when they did not receive advance notice that IHC would be considered for reclassification.  Further, they imply wrongdoing because the reclassification proposal was made by a rival football coach and no one mentioned his "obvious conflict of interest."  Compl. ¶ 20.

#### 2. Legal Standard–Due Process

The Due Process Clause of the Fourteenth Amendment contains both a procedural and substantive component.  Zinernon v. Burch, 494 U.S. 113, 125, 110 S. Ct. 975, 983 (1990).  The procedural component bars "the deprivation by state action of a constitutionally protected interest in life, liberty, or property . . . without due process of law."  Id. (internal quotation omitted) (emphasis in original).  A procedural due process inquiry entails two issues:  (1) whether there is a constitutionally protected liberty or property interest protected by the Due Process Clause, and if so (2) whether the process afforded was adequate.  See Ford Motor Credit Co. v. N.Y.C. Police Dep't, 503 F.3d 186, 190 (2d Cir. 2007).  "In order to have an interest protectable under the Constitution, a person must have a 'legitimate claim of

---

[12]  While the complaint does not indicate whether the due process claim is one for procedural or substantive due process, the allegations and plaintiffs' subsequent arguments make clear that the claim is one for a violation of procedural due process.

entitlement to it.'"  Abramson v. Pataki, 278 F.3d 93, 99 (2d Cir. 2002) (quoting Bd. of Regents of State Coll. v. Roth, 408 U.S. 564, 577, 92 S. Ct. 2701, 2709 (1972)).

Courts in this circuit and elsewhere have held that participation in interscholastic athletics is not protected by due process.  See Seamons v. Snow, 84 F.3d 1226, 1234–35 (10th Cir. 1996) (finding plaintiff did not have a property interest in membership on his high school football team); Walsh v. La. High Sch. Athletic Ass'n, 616 F.2d 152,159 (5th Cir. 1980) (holding Due Process Clause does not protect participation in interscholastic athletic competition); Denis J. O'Connell High Sch. v. Va. High Sch. League, 581 F.2d 81, 84 (4th Cir. 1978) ("[E]ducation is not a fundamental right under the Constitution, and, of course, neither is participation in interscholastic athletics such a right.") (internal citation omitted); Gardner v. Wansart, No. 05 Civ. 3351, 2006 WL 2742043, at *5 (S.D.N.Y. Sept. 26, 2006) (granting defendants' motion to dismiss plaintiff's due process claim because there is no entitlement under state or federal law to participate as a matter of right in college athletics); Mazevski v. Horseheads Cent. Sch. Dist., 950 F. Supp. 69, 72 (W.D.N.Y. 1997) ("[I]t is only when a student is excluded from the entire educational process that due process must be afforded.  His exclusion from a particular course, event or activity is of no constitutional import."); Giannattasio v. Stamford Youth Hockey Ass'n, Inc., 621 F. Supp. 825, 829 (D. Conn. 1985) ("[T]he privilege of participating in . . . interscholastic sports competition is without constitutional protection."); Kellenberg Mem'l High Sch. v. Section VIII, 255 A.D.2d 320, 320 (N.Y. App. Div. 2d Dep't 1998) (affirming dismissal of procedural due process claim in underlying Article 78 proceeding because petitioners failed to demonstrate a constitutionally protected interest in membership in Section VIII).

### 3.  **Analysis–Due Process**

At oral argument, plaintiffs conceded that participation in interscholastic athletics is not protected by due process.  In any event, the plaintiffs here were not deprived of the right to participate in interscholastic athletics.  In fact, IHC and the individual student-athletes have continued to participate in Section III sports programs and have been successful in Class C.  Nor have they been denied membership in Section III.  Instead, Section III prohibited them from competing in Class D, while allowing them to play in Class C.  Since the right to participate in interscholastic athletics is not protected by due process, it follows that competing in a particular Class, within a specific Section, is not constitutionally protected.

Plaintiffs instead contend defendants violated due process because the right to participate in Class D was extended to them and then arbitrarily taken away without the proper procedure.  They essentially argue that the failure to abide by the two week notice requirement (in the handbook) is itself a due process violation.  They insist they should have been provided "prior actual notice that a vote would be held to reclassify IHC's football program to a higher class."  Pls.' Mem. of Law, 14.[13]

This argument focuses solely on the handbook's notice requirements.  The handbook provides that "[a] deadline date should be established a minimum of two weeks prior to a classification meeting in which individual schools, leagues, or sport committees can

---

[13]  While not mentioned by the plaintiffs or relied upon in the complaint, defendants submitted a December 4, 2009, letter sent to IHC and other schools informing them of the upcoming classification meeting scheduled for December 15, 2009.  See Rathbun Aff., Ex. F, Dkt. No. 10–1. The letter indicated that representatives from non-public schools should attend the meeting to respond to classification recommendations and make suggestions of their own.  Defendants argue the letter demonstrates plaintiffs were provided notice (nine days) of the reclassification.  Because it is not integral to the complaint, it is not proper to consider the letter at the motion to dismiss stage.  For the reasons that follow, whether plaintiffs received notice is irrelevant.

request an examination of a non-public team based upon the criteria listed above."
Handbook, Classification Criteria for Non-Public Schools, 5.0.  Plaintiffs ignore the first prong
of a procedural due process analysis—whether there has been a deprivation of a protected
interest.  What plaintiffs here complain they were deprived of—the two weeks notice
promised in the handbook—goes to whether the process afforded was adequate.  To assert
a valid procedural due process violation, plaintiffs must have been deprived of a protected
property interest.  The process itself, or lack thereof, cannot serve as the property interest.

The parties agree there is no constitutionally protected property interest in
participating in interscholastic athletics.  Because there is no protected interest, the
procedural due process inquiry is at an end.  See Wilkinson v. Austin, 545 U.S. 209, 221,
125 S. Ct. 2384, 2393 (2005) (holding that it could reach the second step—what process is
due—only if it finds that a protected interest was at stake).  There is no need to determine
whether the process afforded, particularly the December 4, 2009, letter submitted by
defendants, was adequate because there is no protected interest.

### 4.  **Conclusion–Due Process**

Even accepting plaintiffs' factual allegations as true and drawing all reasonable
inferences in their favor, they have not plausibly stated a procedural due process claim.
Because they have no constitutionally protected property interest in participating in
interscholastic athletics, or maintaining membership in Class D, the procedural due process
claim fails and defendants' motions to dismiss will be granted.

### D. Remaining Claims

In response to defendants' motions to dismiss, plaintiffs consent to dismissal of the Third, Religious Freedom Restoration Act and First Amendment, and Fourth, 42 U.S.C. § 1983, causes of action.

## IV. CONCLUSION

Defendants have a legitimate interest in maintaining balanced competition in Section III.  They assert the classification policy for non-public schools is related to that interest because non-public schools possess certain competitive advantages such as recruiting outside their geographic boundaries.  However, taking the complaint as true and making all reasonable inferences in plaintiffs' favor, they have offered facts to negate defendants' proffered explanation.  They assert non-public schools do not have a competitive advantage over public schools and thus the classification policy, taking into account competitive success, is not rationally related to ensuring equitable competition.  Accordingly, defendants' motions to dismiss the First claim based on the Equal Protection Clause will be denied.

Plaintiffs' Second claim alleging a violation of procedural due process fails.  Even making all inferences in their favor as must be done on a motion to dismiss, they cannot satisfy the first prong of a procedural due process analysis.  They acknowledged at oral argument that there is no protected property interest in interscholastic athletics and thus any argument as to what process they were entitled to is moot.  Because plaintiffs cannot establish a protected property interest, the due process claim will be dismissed.

Finally, plaintiffs' Third and Fourth causes of action will be dismissed on consent of the parties.

Therefore, it is

ORDERED that

1.  Defendants New York State Public High School Athletic Association and Section III's motions to dismiss the complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) are DENIED IN PART and GRANTED IN PART;

2.  The Second (Due Process); Third (Religious Freedom Restoration Act and First Amendment); and Fourth (42 U.S.C. § 1983) causes of action are DISMISSED;

3.  The First (Equal Protection) cause of action is NOT DISMISSED; and

4.  Defendants shall file an answer to the First cause of action on or before July 8, 2011.

IT IS SO ORDERED.

_____
United States District Judge

Dated:   June 23, 2011
         Utica, New York.